UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
06-CV-3037(JMR/FLN)

| | |
|---|---|
| Paul and Patricia Adolphson | ) |
| | ) ORDER |
| v. | ) |
| | ) |
| United States of America et al. | ) |
| | ) |

Plaintiff Paul Adolphson claims the United States and his attending physicians are liable for medical malpractice for negligently failing to warn him of posterior ischemic optic neuropathy, a condition which causes visual defects, prior to his spinal surgery. According to plaintiff, his team of doctors negligently failed to warn him of this possible surgical complication while performing their services at the Veterans Administration Medical Center ("VA") in Minneapolis, Minnesota. Defendants Dr. Stephen J. Haines, a neurosurgeon, and Dr. Dean L. Melnyk, an anesthesiologist, led the surgical team, along with two VA residents in neurosurgery, Drs. Charles R. Watts and Hart P. Garner.[1] Plaintiff's wife, Patricia Adolphson, makes claims against Drs. Haines and Melnyk for loss of consortium.[2]

---

[1] As employees of the VA Hospital, Drs. Hart and Garner enjoy immunity under the Federal Tort Claims Act, 28 U.S.C. § 2679. Plaintiff's claims against them as individuals were dismissed by stipulation on November 13, 2006. Drs. Haines and Melnyk, as independent contractors of the United States, are not immune from suit.

[2] Mrs. Adolphson's claim against the United States was untimely. The parties stipulated to its dismissal on November 13, 2006.

Plaintiff presented at the VA for back surgery in July, 2004. After the procedure, he experienced some vision loss. According to plaintiff, had he been warned of this complication, he would have declined the surgery.

Defendants ask the Court to dismiss plaintiff's claims for failing to satisfy Minnesota's substantive requirements for medical malpractice suits, in accord with Minnesota Statute § 145.682, or, alternatively, for summary judgment. Defendants' motions are granted.

I. Background[3]

On July 26, 2004, plaintiff underwent a redo decompressive laminectomy for lumbar stenosis at the VA. The procedure was the fifth operation on his lumbar spine. The operation was undertaken to remove scar tissue pressing against plaintiff's nerve roots, which caused significant back pain and interfered with sleep and walking. Dr. Haines performed the surgery, assisted by Drs. Watts and Garner. Dr. Melnyk was the anesthesiologist.

Plaintiff and his doctors discussed surgical risks and sedation options in detail on July 13, 2006, and plaintiff signed a written consent form on that date. Once again, on July 25 and 26, immediately prior to surgery, the doctors discussed surgical and anesthetic risks with plaintiff. He again consented, signing

---

[3]The Court construes the facts in the light most favorable to plaintiff. See Hughes v. Strottlemyer, 454 F.3d 791, 793 (8th Cir. 2006).

2

a form for anesthesia services the day of surgery. The consent form specifically warned, inter alia, of "numbness or loss of sensation, loss of limb function, paralysis, stroke, brain damage, heart attack, and death." (Pl.'s Consent for Anesthesia Services signed July 26, 2004.)  Plaintiff was not warned of the risk of post-operative vision loss.

The surgery was scheduled to last three hours.  It actually took just over nine hours due to complications.  When plaintiff was in recovery, he complained of vision loss in both eyes.  The following day, this condition improved to some degree, allowing him to count fingers using his right eye, and 20/50 vision in his left. A VA ophthalmologist diagnosed a posterior ischemic optic neuropathy ("PION").

PION is a rare surgical complication whose mechanism of injury is poorly understood. (Lee Disclosure, May 16, 2007.)[4] The medical community's present consensus is that no one knows exactly what causes PION. (Muzzi Dep. 61, June 18, 2007.) Although the etiology is not entirely clear, id., PION is generally "attributed to decreased ocular perfusion pressure, possible blood loss, anemia, or hemolution."  Igal Leibovich et al., Ischemic Orbital Compartment Syndrome as a Complication of Spinal Surgery in the

---

[4]Andrew G. Lee, M.D., is an expert disclosed by defendants to testify on the issue of causation.  Neither his expertise as a neuro-ophthalmologist, nor his anticipated testimony concerning PION, its cause, and etiology, have been controverted by plaintiff's experts.

3

Prone Position, 113 Opthamology 1, 105 (2006).  This means PION seems to occur when the optic nerve fails to receive the oxygen it needs due to low blood pressure, blood loss, inadequate blood flow, or inadequate oxygen in the blood. (Austin Dep. 48, 51, June 12, 2007.)  There is no proven method by which PION can be prevented, nor is there a known successful treatment for post-surgical PION. (Lee Discl.)  Similarly, there are no known preoperative factors or screening tests by which a patient at risk for PION can be definitively identified. Id. Patients having the same surgical parameters may develop PION, while others having the same parameters and undergoing the same surgery do not.  Id.

   Within a few days of the surgery, the vision in plaintiff's left eye returned to near normal; the right eye, however, continued to have nasal field blurring.  Plaintiff was discharged on August 11, 2004.  At discharge, he was diagnosed with bilateral PION, with left eye vision returning to normal, and some right eye improvement.  At a follow-up visit on September 27, 2004, he reported his vision had improved significantly, but had not returned to baseline.

   Plaintiff saw Dr. Peter S. Austin for vision loss evaluation on November 22, 2005.  Dr. Austin has practiced general ophthalmology in Duluth, Minnesota, since 1978.  Dr. Austin diagnosed plaintiff with post-surgical bilateral PION, and measured plaintiff's vision as 20/20 in his left eye and "count fingers" in

his right eye.  He classifies plaintiff's right eye as "legally blind."

Plaintiff filed suit in July, 2006, and now limits his claim to negligent nondisclosure.[5]  Plaintiff contends he would not have consented to the surgery had he been warned of the risk of vision loss.  In support of his claim, he has submitted two expert witness affidavits, one from Dr. Austin, the other from Dr. Donald Muzzi, a Duluth anesthesiologist, as required by Minn. Stat. § 145.682.

    A.   <u>Dr. Austin</u>

In his declaration and deposition testimony, Dr. Austin states he has never seen or treated an individual, other than plaintiff, who had non-eye surgery with post-operative PION.  He states he is unfamiliar with either the accepted authorities or scientific writings concerning PION's potential causes, with the exception of the single article attached to his affidavit.  Dr. Austin was unable to identify specific causes of PION.  Instead, he offered several hypotheses as to why plaintiff's ocular blood circulation was impaired.  According to Dr. Austin, the most likely cause of plaintiff's post-surgical bilateral PION was decreased perfusion of the optic nerves for an extensive period of time.  Dr. Austin could not, however, state how the decreased blood perfusion condition occurred, or whether plaintiff's long-known chronic

---

[5]Plaintiff withdrew his claim of negligent medical care at the December 18, 2007, motion hearing.

hypertension caused, or was a substantial contributing factor to, the vision loss.

   B.   <u>Dr. Muzzi</u>

Dr. Muzzi avers that the standard of care applicable to both the neurosurgeons and the anesthesiologist at the time of this surgery required defendants to disclose to plaintiff the risk of post-operative visual loss. At deposition, Dr. Muzzi acknowledged that he is not a neurosurgeon, but claims he has sufficient expertise to opine on a neurosurgeon's duty to warn of PION risk relative to obtaining informed consent.

Dr. Muzzi's testimony appears inconclusive as to whether this claimed duty - to warn a patient in plaintiff's position of post-operative visual loss - was actually the standard of care in 2004 when this surgery was conducted. He initially stated Dr. Melnyk should have told plaintiff that, while the surgery was scheduled for three hours, if it went beyond five, six, or seven hours, there was a risk of vision loss. Dr. Muzzi agreed, however, that this standard of care was explicated in the medical literature in 2006, while the surgery took place two years earlier. Additionally, the article to which he alluded merely stated that, in the circumstances described above, a physician should consider warning of the risk.

Dr. Muzzi's initial report also discussed causation. He opined that a combination of factors "in a high risk patient like

Mr. Adolphson may have been responsible for inadequate perfusion of the optic neural tissues." (Muzzi Discl. 8, January 12, 2007.) He admitted during his deposition, however, that he could not say what caused plaintiff's PION, and that the actual cause of post-surgical PION is still unknown in the medical community.

Defendants have moved for dismissal, or, in the alternative, summary judgment, claiming plaintiff's expert disclosures fail to establish a prima facie case of negligent nondisclosure.

## II. Legal Standard

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), a motion for judgment on the pleadings shall be treated as one for summary judgment if matters outside the pleadings are considered. As the parties have submitted evidence outside the pleadings, the Court treats defendants' motion as one for summary judgment. Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Minnesota has established a heightened requirement in medical malpractice suits which mandates that a plaintiff set forth his prima facie case at an early stage of litigation. To satisfy this heightened standard, a medical malpractice plaintiff must submit two different types of expert affidavits. Minn. Stat. § 145.682,

subd. 2.  The first, called an affidavit of expert review, must be served with the complaint.  Id. § 145.682, subds. 2 and 3.  There is no challenge to that requirement here.  The second affidavit is referred to as an affidavit of expert identification, and is the subject of defendants' motion for summary judgment.  This affidavit must be served within 180 days of the suit's commencement, and must disclose the identity and opinions of plaintiff's experts.  Id. § 145.682, subds. 2 and 4.  Specifically, the affidavit:

> must be signed by each expert listed in the affidavit and by the plaintiff's attorney and state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.  Answers to interrogatories that state the information required by this subdivision satisfy the requirements of this subdivision if they are signed by the plaintiff's attorney and by each expert listed in the answers to interrogatories and served upon the defendant within 180 days after commencement of the suit against the defendant.

Id. § 145.682, subd. 4(a).  If these requirements are not met, the causes of action which require proof by expert testimony must be dismissed with prejudice.  Id. § 145.682, subd. 6.

Minnesota's medical malpractice affidavit requirement calls for expert disclosures by witnesses who are reasonably expected to be qualified and competent to offer admissible expert opinions. See Teffeteller v. Univ. of Minn., 645 N.W.2d 420, 427 (Minn. 2002).  The Court must determine, as a matter of law, whether the proffered expert witness is competent to testify concerning the

matter at issue. See Cornfeldt v. Tongen, 262 N.W.2d 684, 692 (Minn. 1977) (Cornfeldt I). In a medical malpractice suit, a competent medical expert must possess both sufficient scientific knowledge and practical or occupational experience in the subject matter upon which they opine. Id. If an expert lacks specific training and experience in the malpractice claim's subject matter, that expert's testimony is insufficient to meet the requirements of Minn. Stat. § 145.682. See Teffeteller, 645 N.W.2d at 427-28.

Plaintiff claims defendants were culpably negligent when they failed to disclose post-operative vision loss as a significant risk of surgery. A plaintiff who seeks to establish a prima facie case of negligent nondisclosure must establish five elements: (1) a duty on the part of the physician to know of the risk; (2) a duty to disclose that risk; (3) breach of that duty; (4) causation, that is, that the undisclosed risk resulted in harm; and (5) damages. Bigay v. Garvey, 575 N.W.2d 107, 111 n.3 (Minn. 1998); Cornfeldt v. Tongen, 295 N.W.2d 638, 640 (Minn. 1980) (Cornfeldt II).

A physician is under no duty to disclose every conceivable surgical risk. Instead, he bears a duty to disclose risks of death or serious bodily harm which have a significant probability of occurring. K.A.C. v. Benson, 527 N.W.2d 553, 561 (Minn. 1995); Cornfeldt I, 262 N.W.2d at 701-02. To meet this burden, the physician must disclose information which a skilled practitioner in good standing in the community would disclose to his or her

patients under similar circumstances. K.A.C., 527 N.W.2d at 561; Kinikin v. Heupel, 305 N.W.2d 589, 595 (Minn. 1981). Expert testimony is necessary to establish those risks similarly skilled practitioners under similar circumstances would disclose. Kohoutek v. Hafner, 383 N.W.2d 295, 299 (Minn. 1986).

III. Analysis

Plaintiff has offered the expert testimony and affidavits of Dr. Austin, ophthalmologist, and Dr. Muzzi, anesthesiologist, in an attempt to establish causation, and to set forth the duty owed to plaintiff. The Court finds, as a matter of law, that the opinions of these two doctors (1) fail to establish causation; (2) fail to define the standard of care owed to the plaintiff; and (3) fail to show a breach of the duty to meet that standard. Therefore, plaintiff has failed to establish his prima facie case of negligent nondisclosure against either defendant.

 A. Causation

Plaintiff's prima facie case falls primarily because of his inability to provide competent proof of causation. A prima facie claim of negligent nondisclosure requires, at a minimum, a showing that the occurrence of the undisclosed risk resulted in harm to the plaintiff. Here, Drs. Austin and Muzzi are, first, incompetent to testify on this question; and second, have failed or declined to adequately opine as to the cause of plaintiff's PION.

On the question of competence, the Court finds neither

physician legally qualified as an expert on the subject of post-operative PION.  Dr. Austin is a general ophthalmologist.  His resume, affidavit, and testimony establish neither the practical experience nor the educational-scientific expertise necessary to qualify as an expert on the subject of post-operative PION.  <u>See</u> <u>Cornfeldt I</u>, 262 N.W.2d at 692.  He has never treated, diagnosed, researched, or written on the subject.  Dr. Austin has virtually no practical experience with PION; indeed, the only patient he has ever seen with post-surgical PION is plaintiff, and he was not the physician who made the initial diagnosis.  Dr. Austin acknowledges a lack of familiarity with the scientific writings regarding either the mechanism of injury or the development of post-surgical PION.  He testified he has no expert opinion regarding the cause of post-surgical PION, whether or not there is any proven method to prevent it, or what risk factors can be screened for PION.

Dr. Muzzi, the anesthesiologist, admits his lack of expertise as to the cause of plaintiff's PION in his deposition.  In response to the question, "You cannot specifically identify what it was specifically that caused this PION in Mr. Adolphson," Dr. Muzzi answered, "Right."  (Muzzi Dep. 59.)  He also agreed that a neuro-ophthalmologist would be better qualified to render opinions on the issue of causation.  Dr. Muzzi is not trained in the field of ophthalmology, and is particularly inexperienced in the rare and poorly understood condition of post-operative PION.  The Court

finds Dr. Muzzi unqualified to testify as an expert on the subject of PION.

In addition to being unqualified as an expert, Dr. Muzzi's testimony does little to causally link the undisclosed risk of PION to plaintiff's vision loss. He agreed that "at the present state of the medical knowledge . . . no one has specifically identified the actual cause of PION," id. at 61, and that in current medical literature and knowledge, there are "reports of associations between various factors and PION, but no definitive causative effect." Id. at 63.

Minnesota law requires more of a medical expert. The Court finds Drs. Austin and Muzzi are not qualified to testify on the issue of PION causation. See Teffeteller, 645 N.W.2d at 427-28 (even a physician with impressive credentials is not qualified to render an expert opinion without specific training and experience in subject matter of malpractice claim). Absent a qualified expert opinion on the issue of causation, the Court must dismiss the case. Minn. Stat. § 145.682, subd. 6; Lindberg v. HealthPartners, Inc., 599 N.W.2d 572, 578 (Minn. 1999). Beyond this, neither of plaintiff's experts establishes that the undisclosed risk, post-operative vision loss, caused the onset of plaintiff's vision loss. Accordingly, plaintiff has not established the essential element of causation.

B.  <u>Duty to Disclose</u>

Even if causation could be established, and it has not been established here, plaintiff's experts have failed to demonstrate that any defendant had a duty to disclose the risk of post-operative vision loss.  To establish that duty, plaintiff must produce expert testimony that the known standard of care at the time this operation occurred required such disclosure.

Dr. Muzzi offers his opinion that plaintiff's doctors had a duty to disclose a risk of PION.  As an anesthesiologist, however, he is unqualified to opine concerning a neurosurgeon's duty of care.  He lacks any experience or training in neurological surgery.  He admits he has never even sat in during a neurosurgeon's explanation of the risks of surgery similar to plaintiff's.  As to the particular claim of negligent failure to warn of post-surgical PION, the Court finds Dr. Muzzi unqualified to testify concerning the risks a skilled neurosurgeon in the same community would have disclosed under similar circumstances.  <u>See</u> <u>Teffeteller</u>, 645 N.W.2d at 427-28.

As an anesthesiologist, however, Dr. Muzzi may reasonably be expected to offer an opinion concerning an anesthesiologist's standard of care.  This fact notwithstanding, Dr. Muzzi's actual opinions fail to establish that, at the time of the surgery, Dr. Melnyk had any duty to disclose a risk of PION to plaintiff.

13

Dr. Muzzi opines that an anesthesiologist has a duty to disclose a risk of post-operative vision loss when a patient is expected to undergo a prolonged procedure, one greater than six or seven hours.  But this was not such a procedure.  Dr. Muzzi acknowledges that plaintiff's surgery was scheduled to last only three hours.  Notably, he offers no testimony suggesting this estimate was not realistic.  He simply contends, without any scientific foundation, that Dr. Melnyk should have anticipated prolonged surgery because the patient was high-risk given his obesity, hypertension, diabetes, and history of prior surgeries.  There is no record evidence, however, that the presence of these factors can reasonably be expected to turn a three-hour procedure into one lasting seven hours.  There is no evidence showing why Dr. Melnyk had any reason to believe the surgery would last longer than three hours.  Even by Dr. Muzzi's stated standard of care, Dr. Melnyk had no duty to disclose.

Beyond this, and importantly, the literature upon which Dr. Muzzi relies fails to establish any duty to warn of PION, and certainly fails to establish that such a warning was the standard of care in 2004, when this operation occurred.  First, Dr. Muzzi cites a 2002 article explaining a mechanism which can cause PION, E.L. Williams, <u>Postoperative Blindness</u>, 20 Anesthesiology Clinics of North America 605-22 (2002).  He also refers to a national registry established in 1999 which documents post-operative PION

occurrences. See id. at 605-06. But this material does not define any warning which ought to be given to a patient, nor does it establish that such a warning is the standard of care in a case like plaintiff's. The article merely establishes that PION was a known condition prior to 2004.

Dr. Muzzi also cites two articles and a practice advisory published in Anesthesiology in 2006, more than a year and a half after plaintiff's surgery. Lori A. Lee et al., The American Society of Anesthesiologists Postoperative Visual Loss Registry, 105 Anesthesiology 652-59 (2006); Postoperative Visual Loss, 105 Anesthesiology 641-42 (2006); Practice Advisory for Perioperative Visual Loss Associated with Spine Surgery, 104 Anesthesiology 1319-28 (2006). The Court finds that a standard of care set forth subsequent to plaintiff's surgery cannot be held to establish defendants' duty on a prior date. If the Court were to find otherwise, it would be tantamount to finding Galen, Hippocrates, or Lister negligent for failing to prescribe or use penicillin.

Even assuming post-2004 literature ought to be considered, these articles do not define a warning as a standard of care. They merely recommend consideration of a warning in particular circumstances. By way of example, the 2006 practice advisory states a physician should consider warning a patient about the "small, unpredictable risk" of vision loss when surgery is estimated to last more than six hours, and blood loss is expected

15

to be substantial. Practice Advisory, 104 Anesthesiology at 1320-21. Neither the duration of this surgery nor plaintiff's blood loss were anticipated in this case. As such, the later-literature's recommendation to consider a warning fails to establish that an anesthesiologist in plaintiff's community owed a duty to warn him of a risk of PION at the time of his surgery.

The Court therefore finds plaintiff has failed to establish that defendants owed him a duty to disclose a risk of post-operative vision loss.

### C. Loss of Consortium

Mrs. Adolphson claims loss of consortium against Drs. Haines and Melnyk. Under Minnesota law, a wife's claim for loss of consortium derives from her injured husband's claim for negligence, and she may only recover from a defendant found liable to her husband for negligence. Thill v. Modern Erecting Co., 170 N.W.2d 865, 869 (Minn. 1969). Based on the Court's finding that plaintiff's prima facie case fails, his wife's claim for loss of consortium fails too.

### IV. Conclusion

For the reasons stated above, the Court finds defendants are entitled to summary judgment, pursuant to Minn. Stat. § 145.682. Accordingly, IT IS ORDERED that:

1. Defendants' motions for summary judgment [Docket Nos. 37 and 44] are granted.

   2.   This matter is dismissed with prejudice.

   LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:   April 10th, 2008


                                    s/ James M. Rosenbaum
                                    JAMES M. ROSENBAUM
                                    United States Chief District Judge